IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

WILLIAM HARRIS, III,

      Plaintiff,

vs.                                                   Case No. 14-1260-JTM

CAROLYN W. COLVIN, Commissioner of
Social Security,

      Defendant.

MEMORANDUM AND ORDER

Plaintiff William Harris, III has applied for Social Security disability and supplemental security income benefits as well as child's insurance benefits, based upon scoliosis and various psychological impairments. His application was denied by the Administrative Law Judge (ALJ) on May 20, 2013, and the Appeals Council denied review on June 19, 2014. Harris advances two allegations of error in the present appeal. First, he contends that the ALJ erred in failing to reasonably articulate the evidence in support of the assessment of Residual Functional Capacity (RFC). Second, Harris argues that the ALJ erred in his assessment of the evidence underpinning the RFC assessment, and that the assessment is not supported by substantial evidence.

Plaintiff-claimant Harris was born on March 5, 1985 and alleges that he became

disabled beginning March 5, 2003. Because he was under that 22 years of age at the time of the alleged onset date, Harris is eligible for child's insurance benefits under section 202(d) of the Social Security Act. He further meets the standards for insured status up to December 31, 2011.

As the ALJ determined, Harris suffers from severe impairments in the form of substance addiction disorder, bipolar disorder, attention deficit hyperactivity disorder (ADHD), and borderline intellectual functioning. The detailed facts of the case, which are incorporated herein, are set forth independently in the ALJ's opinion (Tr. 9-3, Tr. 15-24).

While the ALJ agreed that Harris suffers from various psychological impairments, he further found that none of the impairments were disabling per se. He specifically found that Harris does have scoliosis, but that he has never needed treatment for the condition. The condition only slightly reduces his range of motion. Further, x-rays of Harris's spine presented essentially normal results. Accordingly, the scoliosis is not a severe impairment. (Tr. 16). Harris's psychological impairments do not rise to the level of any listed impairment. (Tr. 17).

The ALJ found that Harris retained the RFC to perform a full range of work at all exertional levels, except that he was limited to simple, routine, repetitive tasks. He is able to maintain attention and concentration for at least two hours at a time, adapt to changes in at a basic level, and accept supervision on a basic level. While he can work alongside others, he should not perform work requiring close cooperation and interaction with them. He should not interact with the general public. (Tr. 18). In light of these abilities, Harris can

work in jobs such as house keeper, cook helper, or linen room attendant. (Tr. 22-23).

The Commissioner determines whether an applicant is disabled pursuant to a five-step sequential evaluation process (SEP) pursuant to 20 C.F.R. §§ 404.1520 and 416.920. The applicant has the initial burden of proof in the first three steps: she must show that she is engaged in substantial gainful activity, that she has a medically-determinable, severe ailment, and whether that impairment matches one of the listed impairments of 20 C.F.R. pt. 404, subpt P., app. 1. *See Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989). If a claimant shows that she cannot return to her former work, the Commissioner has the burden of showing that she can perform other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(f). *See Channel v. Heckler*, 747 F.2d 577, 579 (10th Cir. 1984).

The court's review of the Commissioner's decision is governed by 42 U.S.C. 405(g) of the Social Security Act. Under the statute, the Commissioner's decision will be upheld so long as it applies the "correct legal standard," and is supported by "substantial evidence" of the record as a whole. *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994).

Substantial evidence means more than a scintilla, but less than a preponderance. It is satisfied by evidence that a reasonable mind might accept to support the conclusion. The question of whether substantial evidence supports the Commissioner's decision is not a mere quantitative exercise; evidence is not substantial if it is overwhelmed by other evidence, or in reality is a mere conclusion. *Ray*, 865 F.2d at 224. The court must scrutinize the whole record in determining whether the Commissioner's conclusions are rational. *Graham v. Sullivan*, 794 F. Supp. 1045, 1047 (D. Kan. 1992). The court will not reweigh the

evidence. "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004). Thus the court will not "displace the agenc[y's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Id*. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (applying *Zoltanski* in reviewing ALJ's social security decision).

This deferential review is limited to factual determinations; it does not apply to the Commisioner's conclusions of law. Applying an incorrect legal standard, or providing the court with an insufficient basis to determine that correct legal principles were applied, is grounds for reversal. *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987).

The court finds that the ALJ's decision is based upon substantial evidence which is reasonably articulated in his opinion. The ALJ's opinion carefully references Harris's diagnostic and treatment history, with extensive references to the medical record. (Tr. 19-20), Based upon that detailed examination of the record, including an examination of Harris's history of prescribed medications, the ALJ determined that he was "generally maintained ... on the same medical regimen," and that the evidence indicated this regimen generally provided "adequate symptom relief." (Tr. 19). With respect to his treatment history, the ALJ noted that Harris repeatedly failed to follow through with prescribed treatment. The ALJ concluded that Harris was not as limited as he currently states, given the evidence that "appointments for treatment were made available to him" but "[h]e just

4

failed to take advantage of them." (*Id*.). Conversely, the evidence showed that when Harris followed his prescribed treatment, he experienced "[on]ly moderate limitations on his mental functioning." (Tr. 20).

Harris did have episodes of drug overdoses, but these appear to have occurred at most once a year. In May of 2010, he presented to the emergency room and tested positive for marijuana and barbituates, in what he himself stated was an "attempt[] to get attention." (Tr. 20). He was discharged the same day in stable condition. One year later, in May 2011, he was hospitalized for four days, and was released with the indication that he was stable and feeling well. And in July, 2012, he arrived at the emergency room stating that he was hallucinating after overdosing on his ADHD medication. His medication was changed and he was released the following day. The ALJ accurately concluded that Harris required medical treatment for drug overdoses "on only a few occasions" and in each instance was "easily stabilized." (Tr. 20).

The ALJ addressed the consultative psychological examinations conducted by Robert Barnett (Ph.D.) on September 13 and December 14, 2011, and discussed the results of both. In the first examination, Dr. Barnett noted that Harris first responded to his questions inappropriately, to the point that his behaviour "initially was grossly inappropriate with me during the interview." (Tr. 609). Dr. Barnett was forced to confront Harris "that if he did not respond directly to my questions, we would terminate the interview." Harris then "became more appropriate," and "[h]e eventually made a reasonable effort to respond to my questions." (Tr. 607).

Harris reported to Dr. Barnett that he lives with his girlfriend and their child. He washes the dishes and takes out the trash. He has a drivers license and drives on a limited basis. Dr. Barnett noted that Harris "[i]ntellectually ... gives the impression of functioning in the low to borderline range." (Tr. 608). He also reported that Harris's "thought processes during the interview were mildly illogical but coherent" and without "any disturbance of thought content." (*Id.*) Harris could name the current and previous president, perform serial sevens, and recite four digits backwards and forwards. Dr. Barnett concluded that Harris "appears intellectually limited in a way that would interfere with some types of employment" but that he "appears congnitively capable of simple repetitive work tasks but probably not complex tasks." (Tr. 609).

At the second examination, Dr. Barnett gave Harris a Wechsler Adult Intelligence Scale - IV examination, which indicated that Harris has mild mental retardation. (Tr. 611). The ALJ determined that the examination should be given little weight, since Harris had failed to fully describe the extent of his drug use to Dr. Barnett, and had been treated for overdoses before and after the examination. In addition, Harris himself indicated that he could care for his child, had a drivers license and could drive a car, and could read most a a newspaper. Moreover, the results of the examination were inconsistent with the first examination, where Dr. Barnett indicated only that Harris should refrain from "complex tasks."

The ALJ gave particular weight to the opinions of State agency consultative psychological consultants George Stern (Ph.D.) and Robert McRoberts (Ph.D.). Dr. Stern

6

noted that Harris had previously worked as both a telemarketer and fast food cashier, and both he and Dr. McRoberts concluded that the IQ examination performed by Dr. Barnett should hold little weight. Dr. Stern noted that "throughout his extensive outpatient mental health treatment history [Harris] was never diagnosed with mental retardation or borderline intellectual functioning. In fact, his IQs were estimated to be in the average range." (Tr. 77). Dr. Stern concluded that Harris was most likely "only ... moderately limited in his ability." (*Id*.) Dr. McRoberts reached the same conclusion. (Tr. 108). He found that Harris "should be able to understand and remember simple instructions." (*Id*.) The consultants concluded that Harris could perform simple tasks involving limited interaction with the public.

The ALJ noted that Harris has a poor work history, even in light of his relatively young age, with lifetime earnings of $21,582.24, indicative of a lack of motivation to work. Further, the ALJ noted that Harris engages in some activities of daily living, including shopping, driving, and caring for his son.

The court finds that substantial evidence supports the determination rendered by the ALJ and that this evidence was reasonably articulated in the careful and detailed review of the evidence reflected in the ALJ's opinion.

Nor did the ALJ err in considering the weight of two additional sources cited by the plaintiff in the present appeal, Karen Wakefield (ARPN) and Chris Moran (LCSW), who indicated that they believed Harris suffers from marked limitations in mental functioning. The plaintiff contends that the opinion evidence from Wakefield and Moran "suggests

greater limitations" than those adopted by the ALJ. (Dkt. at 15).

However, the ALJ explicitly considered the evidence from both sources, and determined that the evidence should receive little weight. First, he noted accurately that neither Wakefield or Moran are considered acceptable medical sources within the meaning of 20 C.F.R. § 404.1513(a). Second, the ALJ found that in both instances the opinions were inconsistent with other evidence in the record. Specifically, the ALJ noted Harris's GAF score of 50, indicating only moderate limitations in mental functioning. The ALJ further cited the medical evidence indicating that Harris is stable when he follows his prescribed medications. Finally, the ALJ noted that Harris's activities of daily living were inconsistent with the extreme limitations suggested by Wakefield and Moran. When a non-acceptable medical source is considered, the ALJ's decision will be upheld if it permits the court to follow his or her reasoning. *See Keyes-Zachary v. Astrue*, 95 F.3d 1156, 1163 (10th Cir. 2012) (citing SSR 06-03p, 2006 WL 2329939, *6 (Aug. 9, 2006)). The ALJ's opinion complies with this standard.

Here, the ALJ adequately developed the record and reasonably addressed the evidence in the case. Conversely, the plaintiff has failed to show any material evidence outside that record which was ignored.

Finally, the plaintiff argues that the ALJ erred in determining that Harris's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. 19). However, the ALJ offered several reasons for this conclusion. First, Harris's activities of daily living were inconsistent with the degree of

limitation he claims. "Although the claimant may not be able to engage in all of the activities that he did in the past and it may take him longer to perform the tasks," the ALJ observed, "he is more active than would be expected if all of his allegations were credible." (Tr. 21). As noted earlier, the ALJ further found that Harris has a poor work history, indicative of a lack of motivation to work, and that this further undermined his credibility. (*Id.*) Moreover, the ALJ noted the medical evidence in the record which indicated an ability to work. Specifically, the ALJ referenced Dr. Barnett's opinion, which indicated that Harris could work, and was excluded only from complex tasks.

Finally, also as noted earlier, the ALJ documented the numerous instances where Harris failed to follow through with prescribed treatments. When Harris did follow through, the treatments were generally successful and he was in a stable condition.

*Thompson v. Sullivan*, 987 F.2d 1482 (10th Cir. 1993), cited by the plaintiff, is distinguishable. In that case, the court stressed that the "there is no evidence in the record that the prescription medicine was effective" and that "[t]here is no evidence that Ms. Thompson could work, with or without medication." *Id.* at 1490. The medical evidence as to the effectiveness of medication was thus entirely missing in that case — "the doctors simply do not say." *Id.* Here, as noted earlier, the evidence is that Harris's medications were effective and he improved with treatment (Tr. 20-22), and that Dr. Barnett believed he was capable of performing simple work tasks. Further, the claimant in *Thompson* explicitly testified that she stopped taking the medicine "because she could not afford it." *Id.* at 1486. Harris provided no such evidence in the present action.

Similarly, the plaintiff's reliance on *Frey* is misplaced. In that case, the court found that the ALJ's credibility assessment was erroneous in light of clear evidence of disabling pain, based upon "the extensive testimony and reports of the treating physician." *Frey,* 816 F.2d at 517. There is no such compelling evidence from Harris's treating medical providers in the present action. To the contrary, Dr. Barnett believed that Harris was able to perform work that was not complex. Moreover, in *Frey* there was clear evidence indicating that the treatment cited by the ALJ was *not* safe and effective:

> Unrefuted testimony by both Dr. Warden and Dr. Johns indicated that anti-inflammatory and anti-pain medication appropriate for Frey's degenerative arthritic condition was contraindicated because of the side effects of stomach irritation. Although pain abatement would enhance Frey's ability to perform sedentary work, the side effects would interfere with restoration of his ability to work. Indeed, the implication of Dr. Warden's testimony is that, given the side effects, the pain medications are not prescribed treatment in Frey's case. Accordingly, a determination of disability cannot be precluded in Frey's case by his failure to take pain medication.

*Id.* When evaluating a claimant's credibility, an ALJ may properly take into account the failure to follow through with an effective course of treatment. *Qualls v. Apfel*, 206 F.3d 1368, 1372-73 (10th Cir. 2000) (citing *Hargis v. Sullivan*, 945 F.2d 1482, 1489 (10th Cir. 1991)). The court finds that the ALJ's credibility assessment was not erroneous.

IT IS ACCORDINGLY ORDERED this 24th day of July, 2015, that the plaintiff's appeal is hereby denied, and the decision of the Commissioner is AFFIRMED.

 s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE